Filed 1/24/24  In re L.B. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re L.B. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B329665 (Super. Ct. No. 21JD00112) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. A.B., Defendant and Appellant. | |

A.B. (Mother) appeals from the juvenile court order terminating her parental rights as to her daughter, L.B., and two sons, I.B., and K.B.  (Welf. & Inst. Code, § 366.26.)[1]  She contends

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

the court erred when it found the beneficial parental relationship exception did not apply.  We affirm.[2]

FACTUAL AND PROCEDURAL HISTORY

*Social services history*

In 2012, Mother agreed to a voluntary service plan after using methamphetamine and heroin during her pregnancy with her eldest child, L.B.  In 2018, Mother overdosed after injecting methamphetamine into her arm with L.B. and I.B present.  L.B. observed first responders attempt to revive Mother.  As a result, L.B. and I.B. became juvenile court dependents from 2018 through 2020.  Mother relapsed shortly after that case closed, using drugs daily with her boyfriend B.P., including heroin, methamphetamine, and oxycodone laced with fentanyl.

In July 2021, Mother and the children were homeless. Mother and B.P. had arguments in front of the children.  Mother tested positive for fentanyl, opiates, methamphetamine, and amphetamine.  I.B. witnessed an altercation in which B.P. slapped Mother and she hit him, breaking his nose.  I.B. reported that B.P. slaps L.B.'s face, and B.P. grabbed I.B. and L.B. "very hard."

*Current petition*

In September 2021, Mother overdosed on amphetamine, methamphetamine, benzodiazepine, and opioids.  The children reported she was "screaming."  B.P. dropped her off at the emergency room.  During her hospitalization, the children slept in B.P.'s car.  A social worker found the children "sad and distraught."  The children said B.P. previously yelled at them and they had seen him punch Mother in the face.

---

[2] The children's fathers are not parties to the appeal.

2

L.B. and I.B. were not attending school.  I.B. was behind in school based on numerous absences.  Both L.B. and I.B. needed major dental work resulting from chronic neglect.

The San Luis Obispo County Department of Social Services (the department) filed dependency petitions regarding L.B. (age 8), I.B. (age 7), and K.B. (age 2) (§ 300, subd. (b)(1) as to all three, and subd. (j) as to L.B and K.B.).  The children were placed with a foster parent, their long-term daycare provider.  The juvenile court sustained the petition, removed the children from Mother's custody (§ 361, subd. (c)(1)), and ordered that she receive reunification services.

*Reunification efforts*

Mother was discharged from three residential programs—twice for drug use and once for noncompliance with program rules.

Mother had periods of sobriety during the case.  But she also provided multiple positive drug tests for methamphetamine, fentanyl, and opioids.

At the six-month review hearing, the court accepted a mediation agreement and extended Mother's reunification services for six months.  During the extended period, she used methamphetamine and other drugs on multiple occasions.  She entered a fourth residential treatment program but relapsed three times and stopped submitting to testing.  She left the program without permission of the department and moved in with her new boyfriend, Mr. T.

Mother visited the children regularly in person, by telephone, and remotely by computer.  The foster parent reported I.B. and K.B. showed significant increases in anger and aggression following in-person visits.  The children did not ask about visits or when the next one might occur.

Mother was allowed an unsupervised visit, but contrary to her written agreement with the department, brought Mr. T. During the visit, Mother and Mr. T had a verbal altercation in front of the children. She told the children that if they told anyone he was there, "they would never see her again and would be permanently separated from each other." L.B. cried about this, and I.B. had bad dreams.

Despite direction from the department to the contrary, Mother repeatedly talked to the children about them returning to her care. She brought a puppy to one visit and said the family would be together again when she found housing, and the puppy would be waiting for the children.

At the 12-month review, Mother was participating in several therapy programs but had missed virtually all group counseling and testing at a mandated Drug and Alcohol Services Program. Mother's therapist testified she was actively involved in therapy. He also testified that safety and stability are important to child development and multiple placement changes are detrimental to children. The court terminated Mother's reunification services.

*Selection and implementation hearing*

The social worker's report for the selection and implementation hearing (§ 366.26) stated the foster parent "has known and cared for these kids the majority of their young lives. Her home has always been a steady, stable, consistent, and loving place for them." The children reported they were happy about staying with the foster parent long term and being adopted. The social worker opined that adoption would be in their best interest because it would provide "stability, permanence, structure, support, and love that they all need to continue to grow."

4

The social worker testified as an expert regarding permanency planning and adoption.  She was concerned that ongoing contact with Mother would harm the children because she often gave them false hope they would be back together as a family.  She believed that based on the history of being removed and then returned to Mother's custody, the conflicting messages confused the children.  She testified that during telephone visits, I.B. and K.B. got "riled up" and fought with each other.  On her own initiative, L.B. set a timer and ended the calls after 10 minutes.

The social worker did not believe the children would suffer great harm if their relationship with Mother were severed.  She testified that adoption was important to their well-being by providing the security of a permanent living situation and a sole decision maker.

The children's attorney joined with the department in recommending adoption as the permanent plan.

Mother testified that during in-person visits, the children ran up to her and hugged her.  At the visits, they played, ate snacks, and talked about school.  Mother said K.B. cried at the end of their last visit.  Mother testified she was "losing everything because of little things here and there . . . [T]his is so hard to lose my kids."  She requested that the children be placed with her stepfather.

The Court Appointed Special Advocate (CASA) reported that when the children lived with Mother, their life was "chaotic, with even the basics of food and shelter irregularly provided."  K.B. continued to suffer from "screaming fits, separation anxiety, and food insecurity."  The CASA noted the two older children had been removed from the home once before, and it would be difficult to uproot them again when they were thriving in foster care.  She

stated the children "crave security" and were "very happy" with the foster parent.

The juvenile court found clear and convincing evidence that it was likely the children would be adopted. The court found the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply, terminated Mother's parental rights, and selected adoption as the permanent plan.

DISCUSSION

Mother contends the juvenile court erred when it failed to apply the beneficial parental relationship exception to bar adoption as the permanent plan. We disagree.

After reunification services have been terminated, the court sets a section 366.26 hearing " 'to select and implement a permanent plan for the child.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The statutory preference is termination of parental rights and placing the child for adoption. (§ 366.26, subd. (b)(1).)

The beneficial parental relationship exception allows the court to choose an option other than adoption " 'in exceptional circumstances.' " (*Caden C., supra*, 11 Cal.5th at p. 631.) The exception has three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*) The parent must establish these three elements by a preponderance of the evidence. (*Id.* at p. 629.) What the court must determine "is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

The juvenile court here applied the standards of *Caden C.* and correctly summarized its requirements, stating: "I think that

6

[*Caden C.*] requires the court to find that there is a significant, positive emotional attachment from the child to the parent and that severance of that attachment would result in harm to the child." (See *Caden C., supra,* 11 Cal.5th at pp. 632-633.) As discussed below, Mother has not demonstrated error.

*Regular visitation*

The first element is not at issue here because the parties do not dispute that Mother regularly visited the children.

*Beneficial relationship*

We review the second element—benefit from continuing the relationship—for substantial evidence. (*Caden C., supra,* 11 Cal.5th at pp. 639-640.) Courts must consider "a slew of factors, such as 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs' " to determine whether the child would benefit from a continued relationship with the parent. (*Id.* at p. 632.)

Here, there was evidence that the children had a relationship with Mother even though they spent a significant amount of time outside Mother's custody. The children were 8, 7, and 2 years old when the petition was filed. They were in the foster parent's custody during the 21 months in which the case was pending. During "much of" the previous case from June 2018 through October 2020, L.B. and I.B. were in foster care with Mother's stepfather.

But there was also evidence that the children would not benefit from continuing the relationship. (*Caden C., supra,* at p. 631.) For example, the children were exposed to abusive boyfriends, the children acted out after visits with Mother, and Mother undermined their sense of security by telling them they would return to her custody. On her own initiative, L.B. set a

7

timer and ended the calls with Mother after 10 minutes. The court may consider these negative effects, including Mother undermining their foster placement, in "disentangling" the benefits and burdens of the relationship. (*Id.* at pp. 634, 637.)

The juvenile court was not required to make an explicit finding whether the second element was established. (See *In re Jesse B.* (1992) 8 Cal.App.4th 845, 851 [court required to make express finding regarding detriment only if it concludes exception to adoption applies].) Even though the court did not make a specific finding that continuation of the relationship would not benefit the children, the juvenile court stated, "I don't see the positive attachment as to any of the three children that would require an application of the [*Caden C.*] findings in this case." This finding was sufficient. "The juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on other grounds, *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)

Because there is substantial evidence that the children would not benefit from continuing their relationship with Mother, no error has been shown. "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "[W]e do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.) Moreover,

even if the second element was established, the court properly exercised its discretion when it determined the exception did not apply based on the third element.

*Detriment of termination*

"[T]he parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) A " 'showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation' " is not a sufficient ground to depart from the statutory preference for adoption. (*In re G.H.* (2022) 84 Cal.App.5th 15, 25.) "Friendly or affectionate visits are not enough." (*Ibid*.) " 'To overcome the preference for adoption and avoid termination of the natural parent's [parental] rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.' " (*Ibid*.)

We review the third element for substantial evidence as to factual determinations such as "specific features of the child's relationship with the parent," "the harm that would come from losing those specific features," and "the benefit of adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) We review for abuse of discretion the "delicate balancing" of "the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Ibid*.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination' " ' " such that " ' " " 'no judge could reasonably have made the order.' " ' " (*Id*. at p. 641.)

The juvenile court did not abuse its discretion here. It

stated, "As with these three children and the time that's spent away from their mother's care and the increase in their relationship and advantages with [the foster parent], I don't see the positive attachment as to any of the three children that would require an application of the [*Caden C.*] findings in this case. [¶] For one example, I honestly think that bringing a puppy to a visit is manipulative and was intended to draw emotion from children toward a puppy as opposed to the value of their relationship between this mother and their children."

There is no question Mother loves the children. But Mother testified about the effect losing the children would have *on her*. She did not show that the *children* would be greatly harmed by severing the relationship. "[T]he focus is on the child." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.) " 'What courts need to determine . . . is how *the child* would be affected by losing the parental relationship.' " (*Ibid.*, italics added.)

In our view, the juvenile court did not improperly consider Mother's continuing substance abuse. The court stated, "I am sorry that the mother hasn't made more progress in her case plan and been in a position where the court could make a different decision. But the reality is that is not the case here." The case plan included not only abstinence from illegal drugs and completion of a residential treatment program, but also taking anger management and parenting education classes, and "demonstrat[ing] an ability to meet the basic needs of the children consistently, including safe housing." The juvenile court was not prohibited from considering the continuing substance abuse and abusive incidents with boyfriends. "A parent's continued struggles with the issues leading to dependency are not a *categorical bar* to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637, italics added.) Instead, such issues "often prove

10

relevant to the application of the exception" and "may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid.*)

Such is the case here. Mother's drug use exposed the children to two emergency responses to her overdoses. They continued to be exposed to abusive boyfriends and Mother's representations that the children would again be removed from a stable home and returned to her custody.

The juvenile court did not improperly "compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The children were doing well in a foster home that provided stability and security. Adoption was in the children's best interest because it would provide permanence in a stable home.

The juvenile court properly concluded that Mother did not meet her burden to establish the beneficial parental relationship exception.

DISPOSITION

The juvenile court's orders terminating Mother's parental rights and selecting adoption as the permanent plan, entered June 5, 2023, are affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.

We concur:


YEGAN, Acting P. J.                    CODY, J.

11

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

      Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

      Rita L. Neal, County Counsel, Ann Duggan, Deputy County Counsel, for Plaintiff and Respondent.